**HARTFORD CASUALTY INSURANCE COMPANY, Plaintiff,**

v.

**Eilene Jamie POWELL and Larry Gann, Defendants.**

No. 4:98–CV–62–A.

United States District Court, N.D. Texas, Fort Worth Division.

Sept. 30, 1998.

James Hamilton Moody, III, Jacqueline S. Kelley, H. Michelle Caldwell, Strasburger & Price, Dallas, TX, for Hartford Casualty Insurance Company, plaintiffs.

Eilene Jamie Powell, [Pro se], Ft Worth, TX, Terry Gardner, Gardner & Aldrich, Fort Worth, TX, for Eilene Jamie Powell, Larry Gann, defendants.

### FINAL JUDGMENT AS TO CERTAIN CLAIM

McBRYDE, District Judge.

Consistent with the memorandum opinion and order signed by the court in the above-captioned action on the same date of the signing of this final judgment as to certain claim,

The court ORDERS, ADJUDGES, DE-CREES, and DECLARES (a) that plaintiff, Hartford Casualty Insurance Company, ("Hartford") provides no insurance coverage under Hartford's policy number 45 CSE D62203 (E), and has no liability under such policy, for any claim of defendant Larry Gann ("Gann") against defendant Eileen Jamie Powell ("Powell") for recovery of exemplary or punitive damages arising from the motor vehicle collision that is the subject matter of the claims made by Gann against Powell in Case No. 96–170419–97, on the docket of the District Court of Tarrant County, Texas, 96th Judicial District, styled "Larry Gann v. Eileen Jamie Powell," (which collision, according to the papers in Case No. 96–170419–97, occurred on or about July 29, 1997, on Northwest Loop 820 in Tarrant County, Texas), and (b) that Hartford has no obligation to pay, in whole or in part, any award made in favor of Gann against Powell in Case No. 96–170419–97, or any other action, for exemplary or punitive damages arising from such collision or the conduct of Powell leading up to such collision.

### MEMORANDUM OPINION and ORDER

Came on for consideration the motion of Plaintiff, Hartford Casualty Insurance Company, ("Hartford") for partial summary judg-

ment ("motion"). The court, having considered the motion, the response of defendant Larry Gann ("Gann"),[1] Hartford's reply, the record, the summary judgment evidence, and applicable authorities, concludes the motion should be granted.

## I.

### *Plaintiff's Complaint And Claims*

Hartford seeks a declaration that it has no insuring obligation in relation to claims that have been made by Gann against defendant Eilene Jamie Powell ("Powell") under an insurance policy it had issued to Powell's employer. The allegations of Hartford that are pertinent to the memorandum opinion and order are that:

On July 7, 1995, Hartford issued a commercial auto coverage policy, Hartford Policy No. 45 CSE D62203 (E) ("policy"), to Powell's employer. On July 29, 1997, Powell was involved in an automobile collision with Gann while she was driving a vehicle that was covered by the policy. Gann filed suit against Powell in the 96th Judicial District Court of Tarrant County, Texas, ("the Tarrant County action") seeking recovery of actual damages he sustained because of bodily injuries and property damage he suffered as a result of the collision, and of punitive damages because of Powell's alleged gross negligence.

Hartford seeks a declaration that it does not have any insurance coverage under the policy for any claims resulting from the collision in question, or, alternatively, that it has no liability under the policy for any punitive damages that might be awarded Gann against Powell in the Tarrant County action.

## II.

### *The Motion*

Hartford moves for a partial summary judgment in its favor declaring that any punitive damages that might be awarded Gann against Powell in the Tarrant County action will not be covered by the policy. It argues

that (1) punitive damages can only be awarded against Powell in the Tarrant County action for conduct that falls outside the scope of the policy's coverage, and (2) Texas public policy causes liability for punitive damages not to be insurable.

## III.

### *Pertinent Undisputed Facts Established by Summary Judgment Record*

#### A. *The Insurance Policy.*

Prior to the collision in question, Hartford issued the policy to Powell's employer by which Hartford agreed, subject to the limitations, terms, and conditions of the policy, to pay all sums which any insured thereunder becomes legally obligated to pay as damages because of bodily injury or property damage to which the insurance applies caused by an accident involving an automobile covered by the policy. Potentially pertinent policy provisions are as follows:

> A. COVERAGE.
>
> > We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."
> >
> > . . .
>
> B. EXCLUSIONS.
>
> > This insurance does not apply to any of the following:
> >
> > 1. EXPECTED OR INTENDED INJURY
> >
> > > "Bodily injury" or "property damage" expected or intended from the standpoint of the "insured."

Motion, Ex. B–1, Business Auto Coverage Form, pages 2 and 3.

#### B. *The Tarrant County Action.*

By the Tarrant County action Gann seeks recovery of damages he sustained by reason of the bodily injuries and property damage he suffered as a result of the collision in

---

**1.** Defendant Eilene Jamie Powell has failed to file a response to such motion and the time for filing a response has passed. *See* Rule 7.1(e) of the Local Civil Rules of the United States District Court for the Northern District of Texas.

question, and punitive damages because of Powell's alleged gross negligence. In his state court pleading, Gann described the conduct about which he complains as follows:

> Defendant, EILENE JAMIE POWELL, was hopelessly intoxicated. She did not have control over the vehicle she was operating when she swerved to her left into the grassy median which separated the east and west bound lanes of traffic. Defendant then veered all the way to the right, across all the east bound lanes of traffic, striking the guard rail. After striking the guardrail, the Defendant then swerved all the way back left crossing all the east bound lanes of traffic and the grassy median into the west bound lanes of traffic where she, violently and without warning, slammed into Plaintiff's car which, then, thrust Plaintiff's vehicle into an 18-wheeler truck which had also been traveling in the west bound lanes of traffic.

Motion, Ex. A at 2.

## IV.

### Analysis

As previously noted, the issues raised by the motion are, first, whether punitive damages are within the scope of the policy language and, second, whether the provision of liability insurance under the policy to protect Powell from payment of punitive damages would be contrary to the public policy of Texas. While there is room for persuasive argument that the motion should be granted on the basis of the first issue,[2] the court, without passing on the merit of that ground

of the motion, has concluded to grant the motion based on a resolution of the second issue in favor of Hartford.

The parties seem to be in agreement that the outcome of this diversity action is to be determined by the substantive laws of the State of Texas. While there is no decision by the Texas Supreme Court on the issue of whether the provision of insurance coverage for punitive damages would violate the public policy of Texas, the court has made the *Erie*[3] guess that if this issue were to be presented to the Texas Supreme Court for decision in the context of the facts of this case, its decision would be that the public policy of Texas would be so offended if Hartford were to be required, or permitted, to provide insurance protection to Powell as to any punitive damages that might be awarded against her in favor of Gann that the protection should be denied.

### A. Fifth Circuit Guidelines for Making an "Erie Guess":

In this diversity action, the court is obligated to rule as it believes the Texas Supreme Court would rule on the legal issue that determines the outcome of this case. *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir.) (en banc), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). If the Texas Supreme Court has not decided the issue, as is true in the instant action, the court must make an "*Erie* guess" on how that court would rule. *Rogers v. Corrosion Prods., Inc.*, 42 F.3d 292, 295 (5th Cir.), *cert. denied*, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995).[4]

---

**2.** There is respectable court authority that punitive damages do not constitute sums an insured legally must pay as damages because of bodily injury or property damage (the operative insuring language of the policy) because punitive damages are punishment for aggravated conduct of the insured, not sums the insured is obligated to pay as damages because of injury or damage suffered by the victim. Put another way, perhaps the only reasonable reading of the policy insuring language is that the words "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage'" have reference only to compensatory damages. *See Braley v. Berkshire Mut. Ins. Co.*, 440 A.2d 359, 361–62 (Me.1982) (collecting cases); *Crull v. Gleb*, 382 S.W.2d 17 (Mo.App.1964); *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 134 S.E.2d 206 (1964).

There is no Texas Supreme Court decision on this insurance policy construction issue; and, the court has not undertaken the analysis that would be necessary to predict what the Texas Supreme Court would do if it were to decide the issue. There are decisions of intermediate appellate courts of Texas that would support the position of Gann on this issue, *infra* at 20–31.

**3.** *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**4.** As the Supreme Court has noted, "state law is to be determined in the same manner as a federal court resolves an evolving issue of federal law: 'with the aid of such light as [is] afforded by the materials for decision at hand, and in accor-

The court is not permitted to do merely what it thinks best, it must do what it thinks the Texas Supreme Court would deem best. *Jackson,* 781 F.2d at 397. As the Fifth Circuit recently explained when confronted with the need to predict the law of Mississippi:

> We base our forecast on (1) decisions of the Mississippi Supreme Court in analogous cases, (2) the rationales and analyses underlying Mississippi Supreme Court decisions on related issues, (3) dicta by the Mississippi Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Mississippi courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries. [A]bsent evidence to the contrary, we presume that the Mississippi courts would adopt the prevailing rule if called upon to do so.

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.,* 149 F.3d 378, 382 (5th Cir.1998) (footnote, citations, and internal quotations omitted).

■ While decisions of intermediate appellate courts of Texas "should be given some weight, [ ] they are not controlling where the highest state court has not spoken on the subject." *Rogers,* 42 F.3d at 295. Rather, the court is obligated to make its best effort to predict how the Texas Supreme Court would decide the issue. *Batts v. Tow–Motor Forklift Co.,* 66 F.3d 743, 750 (5th Cir.1995), *cert. denied,* 517 U.S. 1221, 116 S.Ct. 1851, 134 L.Ed.2d 951 (1996). *"Erie* and its progeny require no more of a federal court than conscientiously to satisfy its duty to predict how the state court will decide a question." *Id.*

■ However, once a panel of the Fifth Circuit has settled on the state law to be applied in a diversity case, that precedent should be followed "absent a subsequent state court decision or statutory amendment that rendered [the Fifth Circuit's] prior decision clearly wrong." *Id.* at 747.

B. *The Type of Conduct That Must Exist for Punitive Damages to be Awarded Under Texas Law:*

Section 41.003 of the Texas Civil Practice & Remedies Code provides, with an exception not applicable here, that punitive[5] damages may be awarded in Texas only if the claimant proves that the harm with respect to which the damages are sought results from fraud or malice. The parties seem to be in agreement that if punitive damages are to be recovered by Gann against Powell in the Tarrant County action, the recovery will have to be based on a finding of "malice," as that word is defined in § 41.001(7) of the Texas Civil Practice & Remedies Code. In that section, "malice" is defined as:

> (A) a specific intent by the defendant to cause substantial injury to the claimant; or
>
> (B) an act or omission:
>
> (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (Vernon 1997).

■ Thus, the Texas statute requires, at the least, proof of conduct that is closely akin to an intention to harm. The language of § 41.001(7) was inspired in part by a holding of the Texas Supreme Court in its 1994 decision in *Transportation Ins. Co. v. Moriel,* in which the Court said:

---

dance with the applicable principles for determining state law.' " *Salve Regina College v. Russell,* 499 U.S. 225, 227, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

5. In the Texas statutes and Texas court opinions, the words "punitive" and "exemplary" seem to

be used interchangeably to convey the same meaning. For convenience, in this memorandum opinion the court always uses, except in quoted material, the term "punitive damages" as being synonymous with the term "exemplary damages."

In summary, the definition of gross negligence includes two elements:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

879 S.W.2d 10, 23 (Tex.1994). The rule of *Moriel* restricting the kind of conduct that can lead to an award of punitive damages is a subject of discussion in *Moriel and the Exemplary Damages Act: Texas Tag–Team Overhauls Punitive Damages*, J. Stephen Barrick, 32 Hous. L.Rev. 1059, 1060–62 (1995). As the author of that comment observed, the current (1995) version of § 41.003 deletes gross negligence as a separate basis for an award of punitive damages, and makes the definition of gross negligence articulated in *Moriel* a part of the § 41.001(7) definition of malice. *Id.*[6]

The establishment of an appropriate definition of the type of conduct that will allow a claimant to recover punitive damages from a defendant has been a subject with which the Texas courts have frequently been concerned. *See Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920–21 (Tex.1981). *See also Moriel and the Exemplary Damages Act: Texas Tag–Team Overhauls Punitive Damages, supra,* at 1063–74. However, the Texas Legislature has now taken the matter of defining when punitive damages can be recovered out of the hands of the Texas courts; and, the Legislature's most current product (the 1995 version of § 41.001(7)) provides the definitional ingredient that must be taken into account at this time in deciding the public policy issue.

**6.** The 1987 version of § 41.003 of the Texas Civil Practice & Remedies Code authorized recovery of punitive damages resulting from fraud, malice, or gross negligence. S.B. No. 5, 70th Leg., 1st C.S., ch. 2, 1987 Tex. Sess. Law Serv. 45 (Vernon). Gross negligence was defined in the 1987 version of § 41.001 of the Texas Civil Practice & Remedies Code as follows:

## C. The Purpose of a Punitive Damage Award Under Texas Law:

Over the years the Texas courts have usually said that the purpose of punitive damages is to punish the wrongdoer. *See Smith v. Sherwood*, 2 Tex. 460, 463–64 (1847); *Flanagan v. Womack*, 54 Tex. 45, 50 (1880); *Cotton v. Cooper*, 209 S.W. 135, 138 (Tex. Comm'n App.1919, judgm't adopted). However, from time to time the concept that punitive damages play a compensatory role as well as a punishment role has appeared in Texas court decisions. *See, e.g., Traweek v. Martin–Brown Co.*, 79 Tex. 460, 14 S.W. 564, 565–66 (1890); *Hofer v. Lavender*, 679 S.W.2d 470, 474–75 (Tex.1984); *Qualicare of East Tex., Inc. v. Runnels*, 863 S.W.2d 220, 224 (Tex.App.—Eastland 1993, writ dism'd).

But, by its 1994 decision in *Moriel*, the Texas Supreme Court made clear that, from that point forward at least, the only purpose to be served by a punitive damage award under Texas law is the "public purpose of punishment and deterrence." 879 S.W.2d at 16–17. The Court drew a distinction between compensatory damages and punitive damages, saying, as to compensatory damages, that "[c]ompensatory damages are intended to make the plaintiff 'whole' for any losses resulting from the defendant's interference with the plaintiff's rights," *id.* at 16; and, as to punitive damages, that:

> Punitive damages have an altogether different purpose. *Cavnar [v. Quality Control Parking, Inc.]*, 696 S.W.2d [549,] 555 [Tex. 1985]; *Smith v. Sherwood*, 2 Tex. 460, 463–64 (1847). "The idea of punishment, or of discouraging other offenses usually does not enter into tort law .... In one rather anomalous respect, [punitive damages], the ideas underlying the criminal law have invaded the field of torts." [W. Page Keeton, et al.,] PROSSER & KEETON [ON THE LAW OF TORTS] § 2 [5th ed. 1984] ....

> (5) "Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

*Id.* at 44.

Punitive (or exemplary) damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Id.,* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(3) (Vernon Supp.1994) (defining "exemplary damages" as "any damages awarded as an example to others, as a penalty, or by way of punishment"). The legal justification for punitive damages is similar to that for criminal punishment, and like criminal punishment, punitive damages require appropriate substantive and procedural safeguards to minimize the risk of unjust punishment.

Although punitive damages are levied for the public purpose of punishment and deterrence, the proceeds become a private windfall.

*Id.* at 16–17 (footnotes omitted).

The court emphasized in *Moriel* that the public policy of Texas is to ensure that a defendant who deserves to be punished "in fact receive[s] an appropriate level of punishment," saying:

Our duty in civil cases, then, like the duty of criminal courts, is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment, while at the same time preventing punishment that is excessive or otherwise erroneous.

*Id.* at 17. In the *Moriel* opinion, the Texas Supreme Court reminded that "evidence of a defendant's net worth is relevant in determining the proper amount of punitive damages" and that "the amount of punitive damages necessary to punish and deter wrongful conduct depends on the financial strength of the defendant." *Id.* at 29.

A more detailed statement of the kinds of evidence that are relevant to the issue of the amount of punitive damages to be awarded was given by the Texas Supreme Court in 1998 in its *Owens–Corning Fiberglas Corp. v. Malone* opinion. 972 S.W.2d 35, 40–41 (Tex. 1998). In *Malone,* the court reiterated that punitive damages "are not designed or intended to compensate or enrich individual

victims" but, "[i]nstead, the purpose of punitive damages is to punish a party ... and to deter it and others from committing the same or similar acts in the future." *Id.* at 39–40. The discussion in *Malone* of the kinds of evidence that would be relevant to the issue of the amount of punitive damages to be awarded and the kinds of evidence that would not be relevant to that issue is instructive. *Id.* at 40–41. The Court explained that the goal of whatever evidence is received by the fact-finder on that issue is to assist in determining an appropriate punishment to be imposed on the defendant.[7] *Id.*

The Texas intermediate court decisions that have been handed down since *Moriel* have fallen in line, uniformly treating punitive damages as a form of punishment, not compensation. *See, e.g., Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.,* 941 S.W.2d 138, 147 (Tex.App.—Corpus Christi 1995), *rev'd on other grounds,* 960 S.W.2d 41 (Tex.1998); *Ellis County State Bank v. Keever,* 936 S.W.2d 683, 685 (Tex. App.—Dallas 1996, no writ); *City of San Antonio v. Heim,* 932 S.W.2d 287, 294 (Tex. App.—Austin 1996, writ denied). The interplay between the purpose of a punitive damage award and the public policy of Texas was recognized by a Texas intermediate appellate court in *I–Gotcha, Inc. v. McInnis,* where the court commented:

Following the reasoning of the cases which do not apply contributory negligence percentages to reduce punitive damages, we believe the public policy interests of using punitive damages as punishment rather than as compensation for the plaintiff are best served by having the punitive damages related to the total amount of harm that occurred as reflected by the damages awarded by the jury.

903 S.W.2d 829, 840 (Tex.App.—Fort Worth 1995, writ denied).

In 1987 the Texas Legislature adopted the following definition:

"Exemplary damages" means any damages awarded as an example to others, as a

---

7. One of the kinds of evidence the Court held is not relevant to the amount of punitive damages to be awarded is "insurance coverage ." *Owens–*

*Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 41 (Tex.1998).

penalty, or by way of punishment. "Exemplary damages" includes punitive damages.

S.B. No. 5, 70th Leg., 1st C.S., ch. 2, 1987 Tex. Sess. Law Serv. 44 (Vernon) (codified as § 41.001(3) of the Texas Civil Practice & Remedies Code). Then, by a 1995 amendment to § 41.001 of the Texas Civil Practice & Remedies Code, the Legislature changed the definition to be as follows:

"Exemplary damages" means any damages awarded as a penalty or by way of punishment. "Exemplary damages" includes punitive damages.

TEX. CIV. PRAC. & REM. CODE § 41.001(5) (Vernon 1997).

D. *The Competing Views on the Issue of Whether Public Policy is Violated by the Provision of Insurance Coverage for Punitive Damages:*

■ The view that public policy is violated by insurance coverage for punitive damages in a jurisdiction that treats punitive damages as a form of punishment was explained by the Fifth Circuit in *Northwestern Nat'l Cas. Co. v. McNulty* as follows:

Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.

The policy considerations in a state where, as in Florida and Virginia, punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured.

.    .    .    .    .

Considering the theory of punitive damages as punitory and as a deterrent and accepting as common knowledge the fact that death and injury by automobile is a problem far from solved by traffic regulations and criminal prosecutions, it appears to us that there are especially strong public policy reasons for not allowing socially irresponsible automobile drivers to escape the element of personal punishment in punitive damages when they are guilty of reckless slaughter or maiming on the highway. It is no answer to say, society imposes criminal sanctions to deter wrongdoers; that it is enough when a civil offender, through insurance, pays what he is adjudged to owe. A criminal conviction and payment of a fine to the state may be atonement to society for the offender. But it may not have a sufficient effect on the conduct of others to make the public policy in favor of punitive damages useful and effective. So, at least, seems to be the policy of Florida and Virginia. To make that policy useful and effective the delinquent driver must not be allowed to receive a windfall at the expense of the purchasers of insurance, transferring his responsibility for punitive damages to the very people-the driving public-to whom he is a menace. We are sympathetic with the innocent victim here; perhaps there is no such thing as money damages making him whole. But his interest in receiving non-compensatory damages is small compared with the public interest in lessening the toll of injury and death on the highways; and there is such a thing as a state policy to punish and deter by making the wrongdoer pay.

307 F.2d 432, 440–42 (5th Cir.1962) (footnotes omitted). As this language discloses, the

Fifth Circuit was writing in the context of the substantive law of the States of Florida and Virginia.[8]

A typical example of a court decision that expresses the competing view is *Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964). After noting the Fifth Circuit's opinion in *McNulty*, the Supreme Court of Tennessee disagreed with the Fifth Circuit, giving as its reasons the following:

> FIRST. We accept, as common knowledge, the fact death and injuries on our highways and streets is a very serious problem and such is a matter of great public concern. We further accept, as common knowledge, socially irresponsible drivers, who by their actions in operation of motor vehicles, could be liable for punitive damages are a great part of this problem. We, however, are not able to agree the closing of the insurance market, on the payment of punitive damages, to such drivers would necessarily accomplish the result of deterring them in their wrongful conduct. This State, in regard to the proper operation of motor vehicles, has a great many detailed criminal sanctions, which apparently have not deterred this slaughter on our highways and streets. Then to say the closing of the insurance market, in the payment of punitive damages, would act to deter guilty drivers would in our opinion contain some element of speculation.
>
> SECOND. The language in the insurance policy in the case at bar, which is similar to many types of liability policies, has been construed by most courts, as a matter of interpretation of the language of a policy, to cover both compensatory and punitive damages. Since most courts have so construed this language in the policy, we think the average policy holder reading this language would expect to be protected

against all claims, not intentionally inflicted.

> THIRD. There is often a fine line between simple negligence and negligence upon which an award for punitive damages can be made.
>
> Public policy is the present concept of public welfare or general good. *State ex rel. Loser v. National Optical Stores*, 189 Tenn. 433, 225 S.W.2d 263 (1949), *Ford Motor Company v. Pace*, 206 Tenn. 559, 335 S.W.2d 360 (1960). Public policy is practically synonymous with public good and unless the private contract is in terms of such a character as to tend to harm or injure the public good, public interest on public welfare or to violate the Constitution, laws, common or statutory, or judicial decisions of the State, it is not violative of public policy nor void on that account. *Home Beneficial Association v. White*, 180 Tenn. 585, 177 S.W.2d 545 (1944).
>
> The insurance contract in the case at bar is a private contract between defendant and their assured, Norman Frank Crutchfield, which when construed as written would be held to protect him against claims for both compensatory and punitive damages. Then to hold assured, as a matter of public policy, is not protected by the policy on a claim for punitive damages would have the effect to partially void the contract. We do not think such should be done except in a clear case, and the reasons advanced do not make such a clear case.

383 S.W.2d at 5.

Other examples of court decisions expressing the competing views can be found in the collection of cases discussed in the annotation at 16 A.L.R.4th 11, 1982 WL 198924, titled *Liability insurance coverage as extending to liability for punitive or exemplary damages.* As reflected there, factors that are not relevant to the instant action often have entered into the outcome. For example, even in

---

8. As will be mentioned again at a later point in this memorandum opinion and order, the text of the Fifth Circuit's opinion in *Northwestern Nat'l Cas. Co. v. McNulty* indicates that the holding in the case was the product of the Fifth Circuit's *Erie* guesses as to what the Supreme Courts of the States of Florida and Virginia would have

held. 307 F.2d 432, 434–36 (5th Cir.1962). And, the opinion discloses that the established ingredient of the laws of the States of Florida and Virginia that prompted the Fifth Circuit to rule as it did was that punitive damages are intended to serve as punishment for the wrongdoer and not as compensation.

those jurisdictions where, as a general proposition, public policy prevents insurance coverage for punitive damages, there have been holdings that public policy is not contravened by allowing coverage for punitive damages for which the insured is only vicariously liable. *See, e.g., Magnum Foods, Inc. v. Continental Cas. Co.*, 36 F.3d 1491, 1498 (10th Cir.1994). Also, some of the cases holding that public policy is not contravened have come from jurisdictions in which an award of punitive damages is intended to be compensatory as well as a form of punishment. *Perry v. Melton*, 171 W.Va. 397, 299 S.E.2d 8 (1982); *Fagot v. Ciravola,* 445 F.Supp. 342, 345 (E.D.La.1978). However, the *McNulty* and *Lazenby* opinions discuss the problem in the context of automobile collision facts similar to those presented in the Tarrant County state court action and of laws similar to the laws of Texas relative to the types of conduct for which punitive damages can be awarded and the nature of punitive damages.

### E. *Texas Court Decisions That Have Considered the Public Policy Issue:*

There have been seven decisions of intermediate appellate courts of Texas on the subject of the interrelationship between public policy of Texas and insurance coverage for a punitive damage award. Two of these decisions concerned liability insurance coverage, and five concerned uninsured motorist coverage. In addition, there has been one Fifth Circuit decision on that subject, which concerned liability insurance coverage.

Apparently the first decision of a Texas court in which the issue of whether the public policy of Texas would prevent insurance coverage for a punitive damage award is *Dairyland County Mut. Ins. Co. v. Wallgren*, 477 S.W.2d 341 (Tex.Civ.App.—Fort Worth 1972, writ ref'd n.r.e.[9]). The issue in that intermediate appellate court decision was whether the coverage of an automobile insurance poli-

cy that had been prescribed, pursuant to Texas statutory law, by the State Board of Insurance of Texas for use by insurance companies doing business in the State of Texas, provided insurance coverage for punitive damages assessed against an insured under the policy. *Id.* at 342. The court concluded that the insuring language of the policy was broad enough to extend the coverage to the punitive damage award. The public policy argument of the insurance company was rejected by the court's conclusion that the public policy of Texas was defined by the language of the insurance contract inasmuch as the terms and conditions of the policy contract were prescribed and approved by the State Board and because the policy was written in order to comply with the requirements of the Texas Motor Vehicle Safety Responsibility Act. *Id.* at 342–43.

Next is *Home Indem. Co. v. Tyler*, 522 S.W.2d 594 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). The insurance coverage at issue in *Tyler* was uninsured motorist coverage contained in the standard uninsured motorist provisions of a Texas automobile insurance policy prescribed by Texas law. The insureds under the policy were injured in a motor vehicle collision involving an automobile operated by an uninsured motorist. They sued the uninsured motorist and the insurance company. The jury awarded each of the insureds punitive damages against the uninsured motorist. The trial judge had entered judgment in favor of the insureds and against the insurance company and the uninsured motorist, jointly and severally, for the amounts awarded by the jury as punitive damages as well as the amounts awarded as compensatory damages. On appeal, the insurance company contended that the coverage did not extend to the punitive damage awards, maintaining that coverage under the insurance policy for those awards would contravene public policy. Relying almost entirely on the holding in *Dairy-*

---

9. At the time *Dairyland* was decided, the designation "writ ref'd n.r.e." (writ refused, no reversible error) meant (or was supposed to mean) that the Texas Supreme Court was not satisfied that the opinion in all respects correctly declared the law, but was of the opinion that the application for writ of error presented no error requiring

reversal. TEXAS RULES OF FORM, Appendix A, Table of Notations Used on Applications for Writs of Error at 83 (9th ed.1997); Ted Z. Robertson & James W. Paulsen, *The Meaning (If Any) Of An "N.R.E.,"* 48 TEX. BAR J. 1306 (Dec. 1985). As Robertson and Paulsen point out, "n.r.e." could mean almost anything.

*land County Mut. Ins. Co. v. Wallgren*, the Texas intermediate appellate court affirmed the trial court's judgment. Also, the court noted that the uninsured motorist laws are remedial in nature, and should be interpreted liberally. Finally, the court distinguished uninsured motorist coverage from liability insurance coverage as it might be impacted by public policy, by saying:

> The public policy considerations which might stand against indemnifying a wrongdoer are not relevant to the considerations in the present case. There is no public policy against an insurance company's promise to pay an insured the amount which the insured party has become entitled to recover because of the recklessness of some third party. The plaintiffs in this case have been adjudged to be legally entitled to recover exemplary damages from the operator of the uninsured automobile and it is the insurer's contractual obligation to pay those exemplary damages.

*Tyler*, 522 S.W.2d at 597.

In *Ridgway v. Gulf Life Ins. Co.*, the Fifth Circuit was required to make an *Erie* guess as to the then status of Texas law on the issue of whether Texas public policy would prevent liability insurance coverage to protect an insured against an award of punitive damages against the insured. 578 F.2d 1026 (5th Cir.1978). The Fifth Circuit adopted as its own the district court's opinion holding that there was coverage for the punitive damage award and that public policy was not violated. The insurer maintained that the insurance contract, which the court found extended coverage to the punitive damage award, violated the public policy of the State of Texas. The court rejected that contention, citing as its only authority the holding in *Dairyland County Mut. Ins. Co. v. Wallgren*. A distinction between *Wallgren* and *Ridgway* was that the insurance policy involved in *Wallgren* had been prescribed by

the State Board of Insurance, but the insurance policy involved in *Ridgway* had not been so prescribed. The Fifth Circuit reasoned that inasmuch as the language of the policies were substantially similar, there was no rationale for holding that public policy would be violated by enforcing the *Ridgway* policy if it was not violated by enforcing the *Wallgren* policy. After taking note of the policy reasons why some states have not allowed punitive damages to be covered by liability insurance, in particular, of the Fifth Circuit's holding in *Northwestern Nat'l Cas. Co. v. McNulty, supra* at 685–86, the Fifth Circuit said "Texas, however, apparently does not share this policy, and that ends the inquiry." 578 F.2d at 1030.

In 1987 another intermediate appellate court of Texas dealt with the problem in *American Home Assurance Co. v. Safway Steel Prods. Co.*, 743 S.W.2d 693 (Tex. App.—Austin 1987, writ denied[10]). The issue was whether a liability insurance policy would protect a corporation that was the insured under the policy from a punitive damage award in a tort action. The court took note of the competing views, citing and quoting at length from *Northwestern Nat'l Cas. Co. v. McNulty, supra* at 685–86, and citing *Lazenby v. Universal Underwriters Ins. Co., supra* at 686–87. After having done so, the court decided to narrow its analysis "strictly to the facts at hand." *Id.* at 704. It defined the question it addressed as "[i]s it consistent with Texas public policy for a corporation to insure itself against the gross conduct of its agents?" *Id.* Consistent with court decisions that have held that no public policy is violated by a contract that protects a vicariously liable corporation for a punitive damage award based on the conduct of one of its agents, the court held for the insured. In holding as it did, the court reasoned as follows:

> The question of how to "punish" a corporation is a difficult one. At best, some

---

10. The designation "writ denied" means that the Texas Supreme Court was not satisfied that the opinion in all respects declared the law correctly, but was of the opinion that the application presented no error of law that required reversal or that was of such importance to the jurisprudence of the state as to require correction. TEXAS RULES OF FORM, *supra* n. 9, at 85; Elaine A. Carlson & Roland Garcia, Jr., *Discretionary Review Powers of the Texas Supreme Court*, 50 TEX. BAR J. 1201 (Dec.1987). As Carlson and Garcia point out, denial of an application, like the denial of certiorari by the United States Supreme Court, imports nothing as to the merits of the case. 50 TEX. BAR J. at 1202.

pressure may be exerted on the directors through the corporate shareholders to remove agents of the corporation whose actions or omissions led to the particular conduct being punished. More realistically, the cost of paying the judgment will be borne not by the culpable corporate agents, but by the corporation's customers. *Id.* at 704.

The court added to its reasoning an expression of doubt whether the denial of insurance coverage for liability against punitive damages actually deters culpable actors, going on to explain its reasons for reaching that conclusion that "[i]n Texas, juries are not allowed to consider the defendant's wealth, resources, or other insurance coverage when assessing *compensatory or punitive damages.*" *Id.*[11]

In 1990 another intermediate appellate court in Texas was faced with the issue of whether uninsured motorist coverage would provide payment to an insured for punitive damages recovered by the insured against the uninsured motorist. This time in *Government Employees Ins. Co. v. Lichte* the court, without directly addressing the public policy issue, held that coverage did not exist. 792 S.W.2d 546, 549 (Tex.App.—El Paso 1990), *writ denied per curiam,* 825 S.W.2d 431 (Tex.1991). In concluding, the court said:

> The purpose of allowing the recovery of punitive damages is to punish the wrongdoer. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). In the instant case, the wrongdoer was the uninsured motorist and not the insured. Therefore, we are not bound to follow those cases that hold that an insured's liability insurance policy provides coverage when a judgment is obtained against the insured awarding exemplary damages.

*Id.*

In *Vanderlinden v. United Servs. Auto. Ass'n Property & Cas. Ins. Co.,* an intermediate appellate court of Texas dealt with the issue of whether a request for recovery of punitive damages should be stricken from the plaintiff's pleading in her suit against her own insurance company for recovery of benefits under uninsured motorist coverage extended to her by her insurer. 885 S.W.2d 239 (Tex.App.—Texarkana 1994, writ denied). The court commenced its analysis by a statement of the purpose of punitive damages, saying:

> The issue of punitive damages stands in a unique light in this case. Punitive damages are typically not to compensate a damaged plaintiff for his injuries; rather, they are to discourage the defendant from continuing his heinous activities and to likewise discourage others from similarly misbehaving.

*Id.* at 240. Then, the court dealt with the conflict between the intermediate appellate court decisions in *Home Indem. Co. v. Tyler, supra* at 687–88, and *Government Employees Ins. Co. v. Lichte, supra* at 688. The court chose to follow the *Lichte* decision. In the course of doing so, the court explained:

> The weight of authority lies in favor of the reasoning applied by the El Paso court in *Lichte.* Most of the states that have expressly considered this question have held that in this context an insurance company should not be liable for punitive damages because to allow such a recovery would be antithetic to the acknowledged purpose to be served by rendition of such damages.

*Id.* at 242.

Coverage for punitive damages was again the subject of the opinion of an intermediate appellate court of Texas in *State Farm Mut. Auto. Ins. Co. v. Shaffer,* 888 S.W.2d 146 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In *Shaffer,* the court held that, under usual rules of construction of insurance contracts, the language of the insurance policy there in question would extend the coverage to punitive damages to which the insured was entitled from the uninsured motorist. How-

11. As previously noted, *supra* at 684, the Texas Supreme Court has now held that the financial status of the defendant is relevant evidence to be considered by the jury in determining the amount to be awarded as punitive damages. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 29 (Tex.1994).

**690**

ever, the court looked to the legislative intent of the Texas statute that defined the purpose of uninsured motorist coverage, which the court concluded was to protect conscientious motorists from financial loss caused by negligent financially irresponsible motorists; and, the court also looked to the objective of the Texas Motor Vehicle Safety–Responsibility Act, which the court concluded had as its main objective the protection of persons from potential losses which may arise out of the operation of a vehicle. After studying both statutory enactments, the court said that "it appears that the legislative intent ... is only to provide compensatory damages to an injured party under an uninsured motorist policy." *Id.* at 149. However, the court went on to give a broader public policy reason for prohibiting a recovery of punitive damages under the uninsured motorist policy, saying:

> Additional policy reasons exist for prohibiting a recovery of exemplary damages under the uninsured motorist policy in this case. Exemplary damages are assessed to punish a wrongdoer and to serve as a deterrent to future wrongdoers. This policy does not support rendering damages against State Farm since neither deterrence of wrongful conduct nor punishment of Torres, the wrongdoer, is achieved by imposing exemplary damages upon Shaffer's insurance carrier for Torres' wrongful act.

*Id.* (citations omitted). In conclusion, the court explained "[w]e have already determined that both public policy and the language contained in the Insurance Code and the Motor Vehicle Safety–Responsibility Act limit recovery under an uninsured-underinsured motorist policy to compensatory damages." *Id.* at 149–50.

Finally, in *Milligan v. State Farm Mut. Auto. Ins. Co.,* an intermediate Texas appellate court wrestled the second time with the issue of whether uninsured motorist coverage should extend to punitive damages. 940 S.W.2d 228 (Tex.App.—Houston [14th Dist.] 1997, writ denied). The *Milligan* court is the same court that had ruled in *Home Indem. Co. v. Tyler, supra* at 687–88, that punitive damages were covered by uninsured motorist coverage. In *Milligan,* the court

pointed out that it had relied on *Dairyland County Mut. Ins. Co. v. Wallgren, supra* at 687–88, in reaching the resulted it reached in *Tyler.* Then, the court recognized the appellate court decisions that were contrary to its *Tyler* decision (*State Farm Mut. Auto. Ins. Co. v. Shaffer, supra* at 689; *Vanderlinden v. United Serv. Auto. Ass'n Property & Cas. Ins. Co., supra* at 688; and *Government Employees Ins. Co. v. Lichte, supra* at 687). With reference to the cases denying coverage, the court said:

> Those courts finding exemplary damages are not recoverable under uninsured motorist provisions focus on the policy reasons for imposing exemplary damages. First, the courts note the statutory definition of exemplary damages as "any damages awarded as an example to others, as a penalty, or by way of punishment." Act effective Sept. 2, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 44 (amended by Act effective Sept. 1, 1995) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(5) (Vernon Supp. 1997)). Exemplary damages are assessed both to punish a wrongdoer and to serve as a deterrent to future wrongdoers. Neither deterrence of wrongful conduct nor punishment of the wrongdoer is achieved by imposing exemplary damages against an insurance carrier in this situation. Therefore, the courts in *Shaffer, Vanderlinden* and *Lichte* determined that coverage provisions requiring an insurer to pay damages that a plaintiff was legally entitled to recover from an uninsured motorist because of bodily injury does not include an award of exemplary damages. *Shaffer,* 888 S.W.2d at 149 (both legislative intent and policy reasons do not support rendering exemplary damages against the insurer); *Vanderlinden,* 885 S.W.2d at 242 (to allow recovery would be antithetic to the purpose to be served by punitive damages); *Lichte,* 792 S.W.2d at 549 (because the wrongdoer is the uninsured motorist instead of the insured, exemplary damages are not included).

*Id.* at 230–31 (citations and footnote omitted).

Recognizing the evolving nature of the law of Texas on the subject, the *Milligan* court

rejected its earlier holding in *Tyler*, giving the following as its justification for doing so:

> We find the reasoning expressed in *Shaffer, Vanderlinden* and *Lichte* logical and persuasive. The insuring agreements for uninsured motorist coverage in these cases are identical to the language in the policy here. In view of the Texas Supreme Court's clear guidelines concerning the imposition of exemplary damages and the policy reasons therefor, we no longer accept the position taken in *Tyler*. We instead agree with our sister court's decision in *Shaffer* and hold that the uninsured motorist clause in the auto policy in this case does not cover exemplary damages as a matter of law.

*Id.* at 232.

**F. Other Authorities:**

■ In making its *Erie* guess, the court is directed to consider not only cases of the Texas Supreme Court and of lower Texas courts, but the general rule on the question, rulings of courts of other states to which Texas courts look when formulating substantive law, and other available sources, such as treatises and legal commentaries. *Centennial Ins. Co.*, 149 F.3d at 382; *Jackson*, 781 F.2d at 397. Although it is difficult to say whether Texas looks to any particular jurisdiction in formulating substantive law,[12] cases do reflect that Texas has been mindful of trends in jurisprudence. For example, in *Moriel*, the Texas Supreme Court took note of the law in other states on several different issues—the proper test for punitive damages, bifurcation, the evidentiary burden for gross negligence and punitive damages, and trial court articulation of reasons for upholding or

refusing to uphold a punitive damages award. 879 S.W.2d at 19, 27–32. And, Texas courts have not been hesitant to rely on articles in *American Law Reports* in determining majority trends. *See Vanderlinden*, 885 S.W.2d at 242 (citing Eric Hollowell, Annotation, *Punitive damages as within coverage of uninsured or underinsured motorist insurance*, 54 A.L.R.4th 1186, 1987 WL 419679 (1987)); *American Home Assurance*, 743 S.W.2d at 702 (citing Annotation, *Liability insurance as covering accident, damage, or injury due to wanton or wilful misconduct or gross negligence*, 20 A.L.R.3d 320, 1968 WL 15794 (1968)). Thus, the court is confident that a Texas court would look to Michael A. Rosenhouse, Annotation, *Liability insurance coverage as extending to liability for punitive or exemplary damages*, 16 A.L.R.4th 11, 1982 WL 198924 (1982), as being authoritative in this case.

Rosenhouse notes, "By far the vast majority of these cases [discussing public policy] have reached results consistent with the proposition that it is contrary to public policy to insure oneself against liability for an award of punitive damages, based on one's own conduct, except as to instances in which the conduct on which the award is based is virtually indistinguishable from the conduct which comprises the underlying wrong." 16 A.L.R.4th at 17. And, indeed, a study of the latest authorities available on this subject bears out this conclusion. As best the court can determine, the following states have recognized that it is against public policy to insure oneself against punitive damages:[13] Arizona (*State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 782 P.2d 727 (1989));[14]

---

12. Texas courts have, on occasion, looked to California law as authoritative. *See, e.g., In re Wade*, 923 S.W.2d 735, 737 n. 2 (Tex.App.—Texarkana 1996, writ denied); *Newman v. Minyard Food Stores, Inc.*, 601 S.W.2d 754, 755 (Tex.Civ.App.—Dallas), *writ ref'd n.r.e.*, 612 S.W.2d 198 (Tex.1980).

13. It appears that Alaska endorses this position. *See Providence Washington Ins. Co. v. City of Valdez*, 684 P.2d 861 (Alaska 1984) (assuming that public policy would prohibit liability insurance coverage for punitive damages, but noting that such a policy would not prohibit municipal corporations from insuring against such awards, viewing "this exception to the general prohibi-

tion against insurance coverage of punitive damages as a sound one"). *But see LeDoux v. Continental Ins. Co.*, 666 F.Supp. 178 (D.Alaska 1987) (making an *Erie* guess that coverage would not be void as against public policy, but not citing any Alaska opinions to support that position).

14. Arizona finds, however, that public policy considerations militating against insurance coverage for punitive damages are outweighed by public policy that an insurance company which took a premium for indemnifying against liability for all damages should honor its obligation. *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 782 P.2d 727, 733 (1989).

California (*J.B. Aguerre, Inc. v. American Guarantee & Liab. Ins. Co.*, 59 Cal.App.4th 6, 68 Cal.Rptr.2d 837 (1997)); Colorado (*Lira v. Shelter Ins. Co.*, 913 P.2d 514 (Colo.1996)); Connecticut (*Bodner v. United Servs. Auto. Ass'n*, 222 Conn. 480, 610 A.2d 1212 (1992)); Florida (*U.S. Concrete Pipe Co. v. Bould*, 437 So.2d 1061, 1065 (Fla.1983)); Illinois (*Warren v. Lemay*, 144 Ill.App.3d 107, 98 Ill.Dec. 279, 494 N.E.2d 206, 212 (1986)); Indiana (*Commercial Union Ins. Co. v. Ramada Hotel Operating Co.*, 852 F.2d 298, 306 n. 9 (7th Cir.1988)); Kansas (*Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, 938 P.2d 1281, *cert. denied*, —— U.S. ——, 118 S.Ct. 372, 139 L.Ed.2d 290 (1997)); Minnesota (*Lake Cable Partners v. Interstate Power Co.*, 563 N.W.2d 81 (Minn. Ct.App.1997)); Missouri (*Crull v. Gleb*, 382 S.W.2d 17 (Mo.Ct.App.1964)); Nevada (*Lombardi v. Maryland Cas. Co.*, 894 F.Supp. 369 (D.Nev.1995)); New Jersey (*Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 285 N.J.Super. 575, 667 A.2d 1087 (App.Div. 1995)); New York (*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994)); North Dakota (*Employers Reinsurance Corp. v. Landmark*, 547 N.W.2d 527 (N.D. 1996)); Ohio (*Ruffin v. Sawchyn*, 75 Ohio App.3d 511, 599 N.E.2d 852 (1991)); Oklahoma (*Jordan v. Cates*, 935 P.2d 289 (Okla. 1997)); Pennsylvania (*Butterfield v. Giuntoli*, 448 Pa.Super. 1, 670 A.2d 646 (1995)); Rhode Island (*Douglas v. Bank of New England/Old Colony N.A.*, 566 A.2d 939 (R.I. 1989)); and South Dakota (*City of Fort Pierre v. United Fire & Cas. Co.*, 463 N.W.2d 845 (S.D.1990)).[15]

The cases holding that public policy allows punitive damages to be covered by insurance do so in a limited number of settings. *See, e.g.*, Alabama (*Montgomery Health Care Facility, Inc. v. Ballard*, 565 So.2d 221 (Ala. 1990) (Alabama public policy allows liability insurance to cover punitive damages in the wrongful death context)); Arkansas (*Southern Farm Bureau Cas. Ins. Co. v. Daniel*, 246 Ark.849, 440 S.W.2d 582 (1969) (vicarious liability)); Idaho (*Abbie Uriguen Oldsmobile Buick, Inc. v. United States Fire Ins. Co.*, 95 Idaho 501, 511 P.2d 783, 789 (1973) (adopting the *Lazenby* approach)); Kentucky (*Continental Ins. Cos. v. Hancock*, 507 S.W.2d 146 (Ky.1973) (vicarious liability)); Louisiana (*Sharp v. Daigre*, 555 So.2d 1361 (La.1990) (uninsured motorist context)); Maryland (*First Nat'l Bank of St. Mary's v. Fidelity & Deposit Co.*, 283 Md. 228, 389 A.2d 359 (1978) (vicarious liability)); Tennessee (*Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964)); Vermont (*State of Vermont v. Glens Falls Ins. Co.*, 137 Vt.313, 404 A.2d 101 (1979)); and Virginia (*United Servs. Auto. Ass'n v. Webb*, 235 Va. 655, 369 S.E.2d 196 (1988) (noting *McNulty* overruled by statute)).

15. Some states have no clear policy on the subject (as far as the court can discern). For example, Maine disallows coverage for punitive damages in the uninsured motorist context, but no case addresses liability insurance. *Braley v. Berkshire Mut. Ins. Co.*, 440 A.2d 359 (Me.1982). The court could not find any pertinent cases for Hawaii, Massachusetts, Nebraska, New Hampshire, South Carolina, Utah, or Washington. And, the remaining states that have discussed the matter simply conclude that public policy does not preclude coverage: Delaware (*Whalen v. On-Deck, Inc.*, 514 A.2d 1072 (Del.1986) (no evidence of public policy against such insurance)); Georgia (*Lunceford v. Peachtree Cas. Ins. Co.*, 230 Ga.App. 4, 495 S.E.2d 88, 91–92 (1997) (insurance coverage of punitive damages allowed in liability context, but not in uninsured motorist context)); Iowa (*Skyline Harvestore Sys., Inc. v. Centennial Ins. Co.*, 331 N.W.2d 106 (Iowa 1983)); Michigan (*Meijer, Inc. v. General Star Indem. Co.*, 826 F.Supp. 241 (W.D.Mich.1993), *aff'd*, 61 F.3d 903, 1995 WL 433592 (6th Cir. 1995) (noting that no Michigan case has squarely addressed whether an insured should be permitted to recover punitive damages from an insurer but finding that it appears that Michigan law permits recovery)); Mississippi (*Anthony v. Frith*, 394 So.2d 867 (Miss.1981)); Montana (*Fitzgerald v. Western Fire Ins. Co.*, 209 Mont. 213, 679 P.2d 790 (Mont.1984)); New Mexico (*Baker v. Armstrong*, 106 N.M. 395, 744 P.2d 170 (N.M.1987)); North Carolina (*New South Ins. Co. v. Kidd*, 114 N.C.App. 749, 443 S.E.2d 85 (1994)); Oregon (*A–1 Sandblasting & Steamcleaning Co. v. Baiden*, 293 Or. 17, 643 P.2d 1260 (Or.1982) (distinguishing between "intentional act" and "intentionally inflicted injury")); West Virginia (*Perry v. Melton*, 171 W.Va. 397, 299 S.E.2d 8 (W.Va.1982) (punitive damages are awarded to punish and deter, but also benefit the injured party)); Wisconsin (*Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (Wis.1985)); Wyoming (*Sinclair Oil Corp. v. Columbia Cas. Co.*, 682 P.2d 975 (Wyo. 1984). Many of these note the overriding public policies of freedom of contract and enforcing the terms of a contract against the insurer.

Another source the court is directed to consider in making its *Erie* guess is law reviews. In this category, the court finds two articles to be useful: Michael David Formby, Comment, *Insurability Against Punitive Damages: A Call for Reform*, 23 S. TEX. L.J. 443 (1982); Note, *An Overview of the Insurability of Punitive Damages Under General Liability Policies*, 33 BAYLOR L.R. 203 (1981). Both call for courts to undertake an analysis of the purpose of punitive damages in determining whether insurability of such awards is appropriate. They suggest that, given the punitive and deterrent components of punitive damages, public policy considerations (which at the time the articles were written had not been discussed by Texas courts) should override an analysis of contract language. *See also*, S. Loyd Neal, Comment, *Punitive Damages: Suggested Reform for an Insurance Problem*, 18 ST. MARY'S L.J. 1019 (1986) (advocating legislative reform and insurer's express exclusion of liability for punitive damages).

### G. *This Court's "Erie Guess:"*

At an early date the Texas Supreme Court declared "[t]hat contracts against public policy are void and will not be carried into effect by courts of justice are principles of law too well-established to require the support of authorities ...." *James v. Fulcrod*, 5 Tex. 512, 520 (1851). So far as the court can determine, the Texas Supreme Court has never departed from those fundamental principles. A competing, but subservient, public policy also recognized by the Texas Supreme Court is that "contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." *Missouri, K. & T. Ry. v. Carter*, 95 Tex. 461, 68 S.W. 159, 164 (1902). "The power to make contracts is too valuable a right to be lightly swept away under the general declaration that such contracts are contrary to public policy, and we must come to some definite point of understanding what the public policy offended against consists of." *Id.*

The public policy of Texas is to be found in the unwritten or common-law restrictions, as well as in statutory limitations. *Taylor v. Leonard*, 275 S.W. 134, 135 (Tex.Civ.App.—

Texarkana 1925, no writ). An intermediate appellate court of Texas has said that "[i]n examining an agreement to determine if it is contrary to public policy[,] the court must look for a tendency to be injurious to the public good." *Sacks v. Dallas Gold & Silver Exch., Inc.*, 720 S.W.2d 177, 180 (Tex.App.— Dallas 1986, no writ).

Since the Texas Supreme Court decision in *Transportation Ins. Co. v. Moriel, supra* at 682–84, the conclusions are inescapable that under Texas law an award of punitive damages has as its sole purposes punishment of the wrongdoer and deterrence, and that the public policy of Texas is for the courts of Texas to ensure that defendants who deserve to be punished by punitive damages in fact receive an appropriate level of punishment. *Moriel*, 879 S.W.2d at 16–17. Any uncertainty that might previously have existed as to the status of the law of Texas on that subject was eliminated by the clear, concise, and unequivocal language of the Texas Supreme Court in *Moriel*. The conclusions that are forced by *Moriel* are supported by the analysis by the Texas Supreme Court in its *Owens–Corning Fiberglas Corp. v. Malone* opinion, *supra* at 685–86, of the kinds of evidence that are relevant to the issue of the amount of punitive damages to be awarded. These public policy interests were expressly recognized by the intermediate appellate court in *I–Gotcha, Inc. v. McInnis* when the court explained that "the public policy interest[ ] of using punitive damages as punishment rather than as compensation for the plaintiff" is best served by a rule that causes the punitive damage award to be the total amount of punitive damages found by the jury without reduction under the contributory negligence scheme. 903 S.W.2d at 840. Confirming that the public policy of Texas is that punitive damages serve as punishment of the wrongdoer is the legislative enactment of 1987, as modified in 1995. *Supra* at 685.

Thus, the principles of law declared by the Texas Supreme Court in *Fulcrod, supra* at 693, that contracts against public policy are void and will not be carried into effect by courts of justice would seem to lead to the conclusion that any insurance contract that

prevents a punitive damage award from having its punishment effect is void and unenforceable by a court applying Texas law. And, in fact, that conclusion is now inescapable. The strong public policy of Texas that punitive damages serve to punish the wrongdoer overcomes any competing policy that a contract entered into freely and voluntarily shall be enforced. Contrary to the situation in the *Carter* case, *supra* at 693, the Texas Supreme Court in *Moriel* provided a "definite point of understanding what public policy [is] offended" by insurance coverage that seeks to protect the wrongdoer from an obligation to pay punitive damages.

The precedent created by the Fifth Circuit opinion in *Northwestern Nat'l Cas. Co. v. McNulty, supra* at 685–86, is directly in point here. The *Erie* guess made by the Fifth Circuit in *McNulty* that the Supreme Courts of the States of Florida and Virginia would find that the public policies of those states would be offended by liability insurance covering punitive damages was based solely on the Court's determinations that in those states punitive damages are awarded for the purposes of punishment and deterrence and none other. The reasoning of the Fifth Circuit in *McNulty* would, when applied to Texas law as it now exists, lead to the conclusion that Texas public policy would be offended if Powell were to be protected by the policy from a punitive damage award recovered from her by Gann. Consequently, *McNulty* stands as persuasive authority for an *Erie* guess that the Texas Supreme Court would rule that public policy prevents Hartford from having coverage under the policy for the claim Gann has made for recovery of punitive damages from Powell.

On the other hand, the reasoning of the example given as expressive of the competing view, *Lazenby v. Universal Underwriters Ins. Co., supra* at 686–87, does not fit into the Texas legal landscape. The Texas Supreme Court and Texas Legislature seem to have no misgivings on the issue of whether an award of punitive damage against a wrongdoer will tend to deter. Moreover, under Texas law as it now exists the line between simple negligence and negligence upon which an award for punitive damages can be made is no longer, if it ever was, fine. Texas law makes clear that a strong public policy such as the Texas Supreme Court announced in *Moriel* will prevail over the subservient policy that private contracts be honored. Finally, the Texas Supreme Court and Texas Legislature have made pronouncements that establish in Texas that requiring a wrongdoer to suffer the sting of a punitive damage award is synonymous with public good, with the consequence that necessarily a private contract that would tend to diminish the punishment effect of a punitive damage award would harm or injure the public good. In these respects, the laws of Texas appear to be at variance with the laws of Tennessee as announced by the *Lazenby* court.

A rather dramatic shift in the attitude of the Texas courts since the decisions of the Texas intermediate appellate courts in *Dairyland County Mut. Ins. Co. v. Wallgren, supra* at 687–88, and *Home Indem. Co. v. Tyler, supra* at 687–88, and of the Fifth Circuit in *Ridgway v. Gulf Ins. Co., supra* at 688–89, is reflected by the intermediate appellate court decisions that are discussed at pages 688–91 of this memorandum opinion and order.[16]

---

**16.** Gann, in his response to Hartford's motion, belittles the significance of the uninsured motorist coverage cases. Apparently Gann fails to appreciate that (a) the uninsured motorist cases provide holdings at variance with *Wallgren* on the issue of whether language prescribed by the State Board of Insurance creates a public policy stronger than the public policy that punitive damages serve as punishment, and (b) the uninsured motorist cases emphasize the intensity of the Texas public policy that punitive damages serve as punishment and deterrence, and nothing else, by their holdings that an insured under uninsured motorist coverage cannot have the benefit insurance coverage for punitive damages

even if the State Board prescribed policy language otherwise would extend to those damages, because the payment by the insurer of those damages would not have a corresponding punitive effect on the wrongdoer.

If the holding in an uninsured motorist coverage case were that public policy did not prevent the insured/victim from collecting under his coverage an amount representative of punitive damages he would have recovered from the wrongdoer, such a holding would not be persuasive on the issue of whether public policy would be violated if the liability insurance of the wrongdoer were to cover a punitive damage award against him. In such an event, the wrongdoer would

The shift began with *American Home Assur. Co. v. Safway Steel Prods. Co.*, *supra* at 688–89. While upholding insurance coverage for punitive damages, the Austin Court of Appeals was so apprehensive about placing reliance on the earlier decisions that it chose to restrict the scope of its holding to insurance coverage for a corporation, whose innocent shareholders would bear the brunt of a punitive damage award if insurance coverage were to be denied. Even the *Safway* holding is now subject to question, bearing in mind its reliance on the now discarded rule that a defendant's wealth and resources cannot be considered by a jury in the determination of the amount to be awarded by way of punitive damages.

The pace of the change of attitude has increased with the intermediate appellate court decisions that have been handed down in the 1990s. In holding that uninsured motorist coverage does not extend to an award for punitive damages, the court deciding *Government Employees Ins. Co. v. Lichte*, *supra* at 689–90, placed principal reliance on the fact that the purpose of a punitive damage award is to punish a wrongdoer. While the *Lichte* court does not expressly say so, it is apparent that the underpinning of the *Lichte* decision is that the public policy of Texas that punitive damages serve as punishment of the wrongdoer is so strong that the victim of the wrongdoer will not be permitted to have a punitive damage windfall from an insurance company unless the transaction serves, at the same time, to punish the wrongdoer. Put another way, the policy of Texas that an award of punitive damages be for the purpose of punishment is so strong that there is a related public policy that the victim of the wrongdoer cannot benefit from a punitive damage award unless the benefit corresponds directly to punishment against the wrongdoer.

The same can be said for the *Vanderlinden v. United Servs. Auto. Ass'n Prop. & Cas. Ins. Co.* decision. *Supra* at 27–28. Again, the emphasis was on the public policy of Texas that "[p]unitive damages are typically not to compensate a damaged plaintiff for his injuries; rather, they are to discourage the defendant from continuing his heinous activities and to likewise discourage others from similarly misbehaving." 885 S.W.2d at 240.

In the same vein is the decision in *State Farm Mut. Auto. Ins. Co. v. Shaffer*, *supra* at 689–90, except that in *Shaffer* the court expressly recognized that its denial of coverage was predicated in part on a public policy of Texas that coverage for a punitive damage award should not be permitted "since neither deterrence of wrongful conduct nor punishment of . . . the wrongdoer[ ] is achieved by imposing exemplary damages upon [the insured's] insurance carrier for [the wrongdoer's] wrongful act." 888 S.W.2d at 149.

In *Milligan v. State Farm Mut. Auto. Ins. Co.*, *supra* at 690–91, the intermediate appellate court did a 180–degree turn from its earlier decision in *Tyler*, this time holding that the uninsured motorist coverage did not extend to provide coverage for punitive damages for which the wrongdoer had been, or could be, held liable. In *Milligan*, the court made no bones about it, saying "[i]n view of the Texas Supreme Court's clear guidelines concerning imposition of exemplary damages and the policy reasons therefor, we no longer accept the position taken in *Tyler*." 940 S.W.2d at 232.

The *Milligan* court was correct in its recognition that guidelines issued by the Texas Supreme Court put a different light on the public policy of Texas relative to punitive damages. In *Moriel*, the court laid to rest any uncertainty that had been generated by the previous Texas court decisions that punitive damages have a compensatory element.

---

still be subject to punishment by a punitive damage award recovered against him in an action taken by the insurer of the insured/victim through its subrogation rights. However, quite the opposite is true if the holding in an uninsured motorist coverage case is that public policy prevents there being coverage to the insured/victim. That would mean that the public policy that

punitive damages serve as punishment, and nothing else, is so strong that even the victim of the wrongdoer is not to be permitted to benefit from insurance coverage as to punitive damages. The intermediate appellate court cases indicate that the latter probably is representative of the law of Texas.

*Moriel* made perfectly clear that the only purposes of punitive damages under Texas law are to punish and deter. At the same time, *Moriel* clarified that the only kind of conduct for which punitive damages can be awarded under Texas law in a motor vehicle collision case is akin to intentional conduct. The combination of those two facets of the *Moriel* decision undoubtedly led to the admonition of the Court that the duty of the Texas courts in civil cases, "like the duty of criminal courts, is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment . . . ." 879 S.W.2d at 17.

This 1994 expression by the Texas Supreme Court of the public policy of Texas and the 1995 amendment by the Texas Legislature of the definition of "exemplary damages" leave no room for a logical denial that insurance coverage to protect a wrongdoer from the punishment that otherwise would be inflicted by a punitive damage award is contrary to public policy and unenforceable. That such a conclusion should follow is emphasized by the new rule adopted by the Texas Supreme Court that the wrongdoer's wealth and financial resources can be taken into account in the determination of the amount to be awarded by way of punitive damages. It would be totally illogical, bearing in mind the principles now firmly established by the Texas Supreme Court, to allow an insurance policy to protect the wrongdoer from payment of punitive damages and the sting of a punitive damage award to be borne by an insurance company and, through it, the premium-paying public.

The public policy of Texas that a punitive damage award serve as punishment has been confirmed in yet another way—by the adoption by the Texas Legislature in 1987 of a statute that defines exemplary damages to mean damages "awarded as an example to others, as a penalty, or by way of punishment," *supra* at 685, and by the amendment in 1995 to further restrict the purpose of punitive damages by saying that they are "any damages awarded as a penalty or by way of punishment." *Id.*

So strongly entrenched in Texas is the public policy that a punitive damage award serve as punishment of the wrongdoer that it overrides the legislative policy evidenced by the comparative negligence statute of Texas. *Supra* at 685–86. The Texas court decisions, and legislative enactments, that have gone on the books in the past ten to fifteen years have convinced this court that the Texas Supreme Court would reject the holdings in the *Wallgren* and *Tyler* cases. Moreover, the relatively recent Texas court decisions and legislative enactments cause the court to conclude that the holding of the Fifth Circuit in *Ridgway v. Gulf Life Ins. Co., supra* at 688–89, to whatever extent it might be deemed to have been an *Erie* guess, is clearly wrong when considered in context with the present Texas legal environment.

The court's *Erie* guess is that the Texas Supreme Court would, if presented with the facts of this case, hold that the public policy of Texas would be offended if the coverage of the policy were to protect Powell from a punitive damage award recovered by Gann against Powell, and that, therefore, to whatever extent the coverage of the policy would literally extend to Gann's claim for punitive damages, the coverage is void and unenforceable under Texas law. Therefore, the motion is being granted.

## V.

### ORDER

The court ORDERS that the motion for partial summary judgment of Hartford be, and is hereby, granted; and

The court further ORDERS (a) that Hartford provides no insurance coverage under Hartford's policy number 45 CSE D62203 (E), and has no liability under such policy, for any claim of defendant Gann against defendant Powell for recovery of punitive damages arising from the motor vehicle collision that is the subject matter of the claims made by Gann against Powell in Case No. 96–170419–97, on the docket of the District Court of Tarrant County, Texas, 96th Judicial District, styled "Larry Gann v. Eileen Jamie Powell," (which collision, according to the papers in Case No. 96–170419–97, occurred on or about July 29, 1997, on Northwest Loop 820 in Tarrant County, Texas),

and (b) that Hartford has no obligation to pay, in whole or in part, any award made in favor of Gann against Powell in Case No. 96–170419–97, or any other action, for punitive damages arising from such collision or the conduct of Powell leading up to such collision.

The court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to the rulings made in this memorandum opinion and order.