Ella Ballard, administratrix of the estate of Edna Stovall, deceased, filed suit against Montgomery Health Care Facility, First American Health Care, Inc., and Dr. Kynard Adams, alleging that the defendants provided negligent or wanton care and that their negligence proximately caused the death of Mrs. Stovall. Mrs. Stovall was a patient at Montgomery Health Care Facility, a nursing home. First American Health Care, Inc., is the parent corporation of Montgomery Health Care, and Dr. Adams was Mrs. Stovall's treating physician at the nursing home. The plaintiff claims that as a proximate cause of the defendants' negligence or wantonness, Mrs. Stovall suffered multiple infected bedsores, from which she died.
Mrs. Stovall was admitted to the nursing home on February 8, 1985, suffering from organic brain syndrome, congestive heart failure, osteoarthritis, and hypertension. The first recordation of a bedsore on Mrs. Stovall occurred on February 14, 1985. No bedsores were noted on her admitting physical examination. Bedsores, also known as decubitus ulcers and pressure sores, are caused by the compression of body tissue between a bony structure and a supporting *Page 223 
structure such as a bed or wheelchair.[1] This pressure obstructs the blood supply to the tissues, resulting in a deprivation of oxygen and nutrients to the area.[2] The early stages of pressure sores involve only superficial tissues. In later stages, fat, muscle, and even the underlying bone can be affected. Bacterial infection of the sore can lead to the patient's death.[3]
On August 14, 1985, Mrs. Stovall was sent to St. Margaret's Hospital for surgical debridement of multiple decubitus ulcers on her left hip, left upper thigh, and left heel. Debridement is the removal of dead tissue from the sore. On February 17, 1986, she was again sent to St. Margaret's Hospital, this time for debridement of a decubitus ulcer on her right hip. The operation was performed on February 21, 1986. Decubitus ulcers were also noted on her left hip, legs, and back. Mrs. Stovall died in the hospital on March 4, 1986. Her death certificate listed the cause of death as cardiopulmonary arrest due to multiple decubitus with sepsis due to a chronic vegetative state. The evidence presented at trial was disputed as to whether she was in a chronic vegetative state.
After trial, the jury returned a verdict against Montgomery Health Care Facility and First American Health Care, Inc., for $2 million, and a verdict in favor of Dr. Adams. Montgomery Health Care and First American filed motions for judgments notwithstanding the verdict and for new trial, which were denied by the trial court.
On appeal, the defendants argue that the trial court erred in admitting into evidence survey reports by the Alabama Department of Public Health, in denying their motion for a mistrial, in denying First American's motion for a directed verdict, and in denying the defendants' request for a remittitur.
The defendants argue that the trial court incorrectly admitted into evidence survey and complaint reports regarding the nursing home. These reports, compiled by the Alabama Department of Public Health, contained information about deficiencies found in the nursing home. The defendants claim that this information is inadmissible as evidence of notice to the defendants, under Flint City Nursing Home, Inc. v.Depreast, 406 So.2d 356 (Ala. 1981). However, in Flint CityNursing Home, this Court held that evidence of notice to a defendant of an alleged dangerous condition or defect can be relevant to the issue of negligence and is admissible if the alleged defect proximately caused or contributed to the injury involved. In that case, evidence relating to 4 of 16 deficiencies found in a nursing home by the Alabama Department of Public Health was held inadmissible because those deficiencies did not proximately cause or contribute to the patient's death. In this case, however, there was evidence that the deficiencies noted proximately contributed to Mrs. Stovall's death. The deficiencies admitted into evidence were inadequate documentation of treatment given for decubitus ulcers; 23 patients found with decubitus ulcers, 10 of whom developed those ulcers in the facility; dressings on the sores were not changed as ordered; nursing progress notes did not describe patients' ongoing conditions, particularly with respect to descriptions of decubitus ulcers; worsening of decubitus ulcers; ineffective policies and procedures with respect to sterile dressing supplies; lack of nursing assessments; incomplete patient care plans or lack of such plans; inadequate documentation of doctors' visits, orders, or progress notes; a.m. care not consistently documented; inadequate documentation of turning of patients; incomplete "activities of daily living" sheets; "range of motion" exercises not documented; orders for placing patient up in chair not consistently documented; patients *Page 224 
found wet and soiled with dried fecal matter; lack of bowel and bladder retraining programs; incomplete documentation of ordered force fluids; inaccessible water pitchers; monthly weighing of patients was not done; incomplete documentation of food consumption; tube feeders were not receiving their feedings as ordered; linen was not handled properly to prevent the spread of infection; vital signs not checked as ordered; inadequate staffing; the director of nursing was not responsible for the standards of nursing practice; charge nurses had not been responsible for the supervision of nursing activities; the governing body in its management through the administrator had not enforced rules and regulations concerning patients' health and safety due to deficiencies noted in nursing services such as bowel and bladder training, activities of daily living, ambulation, patient care planning, and infection control.
There was evidence that all of these deficiencies contribute to the development or worsening of pressure sores. Pressure should be kept off the sore. One way to accomplish this is to turn the patient regularly. Proper nutrition is needed to facilitate healing. Weighing the patient regularly is one way to insure that he is being fed properly. The wound must be kept clean and must be treated regularly. The patient should be exercised and assisted with walking, if possible, to prevent contraction of joints. The less active a patient is, the more likely he is to develop pressure sores, and the more difficult the sores are to treat. Documentation of such treatment is necessary in order to monitor progress, to know which treatments have been effective with the patient, to know which treatments the previous shift has provided, etc. Adequate staff must be maintained and properly trained and supervised in order to carry out these functions.
Further, there was evidence that the care given to Mrs. Stovall was deficient in the same ways noted in the survey and the complaint reports. Her ulcers developed within the facility. Her records contain very incomplete documentation of the development and treatment of her pressure sores. Her records even contain entries for days before she was admitted to the nursing home. Her children testified that while she was in the nursing home they found her wet and soiled at times and noticed dirty dressings on her sores. Mrs.Stovall's records do not contain monthly progress notes by her treating physician. Her records do not indicate that she had been exercised or turned as ordered, and they contain gaps in the documentation of a.m. care. Her "activities of daily living" charts are incomplete. Her records do not contain entries to show that she was ambulated or placed up in a chair as ordered. Mrs. Stovall was incontinent as early as February 1985, but there was no bowel or bladder retraining program for her until July 1985. Her food and fluid consumption was not consistently documented. One daughter testified that at times she had to get water for her mother. Mrs. Stovall was not weighed monthly as ordered. Her vital signs were not regularly documented during her first admission to Montgomery Health Care. There was evidence of lack of training and supervision of the nurses treating Mrs. Stovall. Two nurses testified that they did not know that decubitus ulcers could be life threatening. One nurse testified that she did not know that the patient's doctor should be called if there were symptoms of infection in the sore. When her daughters complained to the staff about her lack of care, they were told that staffing was inadequate. Three of Mrs. Stovall's nurses testified that the facility was understaffed. One nurse testified that she asked her supervisor for more help but that she did not get it.
The trial court gave the jury a limiting instruction stating that the deficiencies noted in the survey and complaint reports were to be considered solely on the issue of whether the defendants had notice of the alleged conditions. As discussed above, the deficiencies cited and admitted into evidence were directly related to the development of pressure sores from which Mrs. Stovall died. The plaintiff deleted deficiencies in the reports that did not relate to the development of pressure sores. Moreover, there was evidence that the care given to *Page 225 
Mrs. Stovall was deficient in the same ways as those noted in the survey and complaint reports. Because the jury could find that the deficiencies noted were deficiencies that proximately caused Mrs. Stovall's death, this evidence was admissible and the trial judge did not abuse his discretion in admitting it.
Next, the defendants argue that the trial court erred in denying a motion for a mistrial because of statements made by counsel for the plaintiff during his opening statement. Plaintiff's counsel allegedly referred to prior proceedings before the Montgomery County Circuit Court in which the court entered a temporary restraining order against the nursing home, appointing an administrator and removing some patients. The trial court has wide discretion in deciding whether an incident occurring during trial has affected a party's right to a fair trial, and its decision will not be reversed unless "it clearly appears that its discretion has been abused." General FinanceCorp. v. Smith, 505 So.2d 1045, 1049 (Ala. 1987). Here, the record does not contain a transcript of the opening statements. It is not clear what the plaintiff's counsel said or even if he made the alleged statement. We cannot say that the trial judge abused his discretion in denying the motion for a mistrial.
The defendants also argue that, later in the trial, evidence concerning the prior proceeding was improperly admitted. Only once was there a proper objection. Counsel for the plaintiff was questioning an inspector who had given an affidavit based on an inspection. The inspector could not recall the circumstances of the affidavit and, in order to refresh her recollection, plaintiff's counsel asked her if she recalled a court proceeding in which the Department of Pensions and Security sought to remove some patients. The trial judge overruled the objection but gave a limiting instruction stating that the jury was not to consider the question as evidence. Counsel for the defense later extensively questioned a witness about the administrator appointed by the court as a result of the prior proceeding and the fact that the temporary restraining order was dissolved. Thus, there was no prejudice resulting from the plaintiff's questioning of the inspector.
Next, the defendants claim that First American, as the parent corporation of Montgomery Health Care, was not liable for the torts of its subsidiary. The test for liability enunciated inLarrimore v. Hospital Corp. of America, 514 So.2d 840 (Ala. 1987), is whether First American was the employer of the alleged tort-feasors or whether it controlled or retained the right to control the day-to-day operations of Montgomery Health Care Facility. See also Duff v. Southern Ry., 496 So.2d 760
(Ala. 1986); Ex parte Baker, 432 So.2d 1281 (Ala. 1983). Sufficient evidence of such control was presented for the jury to find First American liable. First American owned and managed Montgomery Health Care. First American was a small family-owned corporation, and it held 100% of the stock of Montgomery Health Care. When First American first bought Montgomery Health Care, Joni Hill, the president of First American, acted as the administrator of the nursing home until a permanent administrator was found one month to six weeks later. Ms. Hill testified that after the new administrator took over she (Mrs. Hill) visited the facility several times a month to check on office administration and to tour the entire facility, including patients' rooms and the nurses' desk. She even testified that she would sometimes push the nurses' call button in patients' rooms to see how long it would take the nurses to respond. She testified that she went through the home as a surveyor would, checking patients and watching employees. She further testified that when she was unable to visit the facility her father, also an officer of First American, was in the facility almost every day. She testified that First American received copies of the Alabama Department of Public Health reports and thus knew of the deficiencies found in the nursing home. A "committee of the whole," composed of the facility's administrator, assistant administrator, director of nursing, and medical director, *Page 226 
established the policy for the home. The administrator of the nursing home reported directly to Joni Hill and was directly responsible to her. Based upon these facts, there was sufficient evidence for the jury to conclude that First American controlled, or retained the right to control, the day-to-day operations of the home and was liable for the neglect suffered by Mrs. Stovall.
Last, the defendants argue that the punitive damages award of $2 million was greater than necessary to meet society's goal of punishing them and was therefore excessive, because they are bankrupt and insurance would have to cover the award. The trial court held a hearing pursuant to Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), on the defendants' request for a remittitur and held that the bankrupt status of the defendants did not require a remittitur. Specifically, the trial court found that, because of the bankruptcies, the defendants would not be adversely affected by the verdict. Further, the court noted that "Alabama public policy allows liability insurance to cover punitive damages in the wrongful death context." The trial court also found that because of the large number of nursing home residents vulnerable to the type of neglect found in Mrs. Stovall's case the verdict would further the goal of discouraging others from similar conduct in the future. The evidence in the record supports these findings. Thus, the trial court correctly denied the defendants' motion for remittitur.
AFFIRMED.
HORNSBY, C.J., and JONES, ADAMS and KENNEDY, JJ., concur.
[1] J. Agris and M. Spira, "Pressure Ulcers: Prevention and Treatment," 31 Clinical Symposia, No. 5 at 2 (1979).
[2] B. Kozier and G. Erb, Fundamentals of Nursing, Chap. 21 at 497 (Addison-Wesley Pub., 2d ed. 1983).
[3] Clinical Symposia, supra, at 2; Fundamentals of Nursing, supra, at 497.