After Linda Kult was injured in a multivehicle automobile accident in Baldwin County, she and her husband, Ronald Kult, sued multiple individuals who had also been involved in the accident, along with relevant insurance companies, in the Baldwin Circuit Court, alleging negligence and/or wantonness. Ronald Kult also stated a loss-of-consortium claim. Following a two-day trial, the jury returned a verdict awarding Linda Kult $100,000; it awarded Ronald Kult nothing. The Kults, who are residents of Minnesota, now appeal from the judgment entered on that damages award. We affirm.
 I.
On March 8, 2001, Ronald Kult's cousin, Frank Pribil, gave the Kults a ride in his vehicle to pick up their vehicle, which was at another location. As they were traveling west on Canal Road in Orange Beach, Pribil stopped his vehicle behind some other vehicles that were waiting on a school bus, which had stopped to unload children. While they were waiting, their vehicle was struck from the rear by a vehicle owned and operated by Billy Jack Kelly. Kelly's vehicle was struck either before or after it ran into Pribil's vehicle by a vehicle owned by Fay Imbrenda and being operated by Brandy Cherie Hart. The force of Kelly's vehicle striking Pribil's vehicle also propelled Pribil's vehicle into the vehicle in front of it, which was owned and being operated by Larry Whitaker, which then struck the vehicle in front of it, which was owned and being operated by Ronald Foisie.
Linda Kult was transported to South Baldwin Hospital after the accident, where she was treated for neck, back, leg, and a rib pain. She was diagnosed with a cervical strain and a rib injury; medication was prescribed to assist with the pain. In early April 2001, the Kults returned to Minnesota, and Linda sought follow-up treatment for her pain and injuries.[1] Over approximately the next two years, Linda consulted with a number of doctors and medical professionals concerning her injuries and ongoing pain, including Dr. Martha Sanford, her primary physician in Minnesota; Dr. Bartee, [2] an orthopedist in Minnesota; Dr. Waisley, a chiropractor in Minnesota; Dr. Thomas Yearwood, a pain specialist in Fairhope; Dr. Marcus Schmitz, a neurosurgeon in Florida; Dr. Paul Matz, a physician in Birmingham; Dr. Kim, a physician in California; Dr. Boeve, a neurologist in Minnesota; and Dr. Krauss, a neurosurgeon in Minnesota. However, Linda did not obtain a substantial measure of relief until April 2003, when Dr. John C. Chiu, a surgeon in California, performed two separate endoscopic procedures to remove three thoracic (middle-back) and three lumbar (lower-back) disks in her back. At trial, Linda testified that she continues to have a loss of feeling in some areas of her right side but that she was finally able to discontinue the use of pain medication approximately two months after Dr. Chiu operated on her back.
On March 10, 2003, the Kults sued Brandy Cherie Hart, Fay Imbrenda, Billy Jack Kelly, Frank Pribil, Larry Whitaker, and Ronald Foisie, alleging that their negligent and/or wanton misconduct had caused the automobile accident that resulted in Linda's *Page 554 
injuries. Ronald Kult also stated a loss-of-consortium claim. Because Hart, Imbrenda, and Kelly were all uninsured at the time of the accident, the Kults also named their own uninsured/underinsured-motorist carrier, Western National Mutual Insurance Company, as a defendant. See Ex parteState Farm Mut. Auto. Ins. Co., 893 So.2d 1111, 1115
(Ala. 2004) ("Under Alabama law, a plaintiff may join as a defendant his uninsured/underinsured-motorist carrier in an action against another motorist. Ex parte Boles,720 So.2d 911, 914-15 (Ala. 1998)."). The Kults later amended their complaint to add as a defendant Auto Owners Insurance Company, Pribil's uninsured/underinsured-motorist carrier.
After the discovery process began, Foisie, Pribil, and Whitaker all individually moved for summary judgments. The trial court granted Foisie's motion on March 10, 2004, and Pribil's and Whitaker's motions on June 15, 2004. The defendant insurance companies, Western National Mutual Insurance Company and Auto Owners Insurance Company, also filed separate motions to "opt out" of the litigation pursuant to this Court's decision inLowe v. Nationwide Insurance Co., 521 So.2d 1309, 1310
(Ala. 1988), which held that an insurance company has the right to elect either to participate or not to participate in a trial in which a plaintiff seeks to recover from the alleged uninsured/underinsured tortfeasor while also seeking benefits from the insurer pursuant to an uninsured/underinsured-motorist policy; under either election, the insurer is bound by the fact-finder's decisions on the issues of liability and damages. Both Western National Mutual Insurance Company's and Auto Owners Insurance Company's motions to opt out were granted. Thus, when the case was called for trial on September 11, 2006, the only remaining defendants were Hart, Imbrenda, and Sherlyn Kelly, as administratrix of the estate of Billy Jack Kelly, deceased.[3] Hart and Imbrenda, however, failed to appear in court on that date, and, when they again failed to appear on September 14, 2006, the trial court granted the Kults' motion for a default judgment as to those defendants.
The Kults then asked the trial court to allow them to present evidence so the trial court could immediately assess damages against Hart and Imbrenda; however, after Kelly objected, the trial court indicated that it would hear that evidence later, and the trial commenced. After the Kults presented their case, Kelly moved for a judgment as a matter of law on the negligence and wantonness claims. The trial court denied the motion as to the negligence claim but entered a judgment as a matter of law in favor of Kelly on the wantonness claim. Kelly then presented her defense, and the case was submitted to the jury, which ultimately returned a verdict in favor of the Kults on the negligence claim, awarding Linda $100,000 and Ronald nothing.
Because she had previously offered to settle the case for $250,000, Kelly filed a postjudgment motion to tax costs to the Kults; however, after a hearing, she withdrew her motion. The Kults also moved for an additur or, in the alternative, for a new trial; however, their motion was denied by the trial court, and, on December 27, 2006, the Kults filed this appeal.
 II. "In discussing the standard of review in an appeal from a judgment based on a jury verdict where the trial court has *Page 555 
denied a motion for a new trial, this Court has stated:
 "`Jury verdicts are presumed correct, and this presumption is strengthened by the trial court's denial of a motion for a new trial. Therefore, a judgment based on a jury verdict will not be reversed unless it is `plainly and palpably' wrong."'
 "Tanksley v. Alabama Gas Corp., 568 So.2d 731, 734 (Ala. 1990) (quoting Davis v. Ulin, 545 So.2d 14, 15 (Ala. 1989))."
Petty-Fitzmaurice v. Steen, 871 So.2d 771, 773
(Ala. 2003). Thus, to determine whether the Kults are entitled to a new trial, we must determine whether they have established that the judgment entered on the jury's damages award was "`plainly and palpably' wrong." The Kults make five arguments on appeal.
 III.
The Kults first argue that the trial court erred when it declined to assess damages against the defaulting defendants, Hart and Imbrenda, immediately after the default judgments against Hart and Imbrenda were entered. The Kults argue that the trial court was required to do so by Rule 38(d), Ala. R. Civ. P., which provides, in pertinent part, that "[a] party seeking affirmative relief may withdraw that party's demand for a jury as to any defaulting party without the consent of that party and have that party's damages assessed by the court without a jury." Kelly argues that the trial court did not err and that the court was entitled to wait to assess damages against Hart and Imbrenda until after the trial pursuant to Rule 55(b)(2), Ala. R. Civ. P., which authorizes the trial court to "conduct such hearings or order such references as it deems necessary and proper" when assessing damages against defaulting parties. Kelly also argues that the Kults waived any argument in this regard by agreeing, when the verdict form was drafted, that whatever verdict was entered against Kelly was good as to all the defendants, including Hart and Imbrenda. We agree.
After the defense finished presenting its case, the Kults' attorneys held the following colloquy with Kelly's attorney and the trial court judge to discuss the format of the verdict form:
 "PTF ATTY 1: And just to clarify, we do have a default judgment against one of the defendants?
 "PTF ATTY 2: Two of them.
 "PTF ATTY 1: Against two of them —
 "DFT ATTY: Right.
 "COURT: Yeah.
 "PTF ATTY 1: Both of which were —
 "COURT: And we read that into the record at the beginning of the case.
 "DFT ATTY: And whatever this jury does with this case, whatever judgment is entered it's joint and several against them, the estate, whatever.
 "PTF ATTY 3: Yeah.
 "COURT: All right.
 "PTF ATTY 1: But, judge, how do we need to get a default judgment as to damages as to those —
 "DEF ATTY: You're about to do it.
 "PTF ATTY 1: Those two defendants.
 "COURT: Whatever the jury comes back with —
 "DFT ATTY: Whatever the jury comes back with.
 "COURT: — that's against them also.
 "DFT ATTY: It's against not only my client but the rest of them. Bottom line is the [uninsured/underinsured-motorist] carrier picks up the tab regardless of who the defendant is.
 "PTF ATTY 2: Judge, you are going to give the joint and several instruction? *Page 556 
 "COURT: No, no, because, remember, we think that will be confusing to them. What we've agreed on the record, that any judgment will be joint and several against the two defendants that you took a default against —
 "PTF ATTY 2: Okay.
 "COURT: — and the estate."
Thus, during this discussion, the Kults' attorneys agreed that the damages against the two defaulting parties, Hart and Imbrenda, would be included in the amount the jury awarded the Kults on their claims against Kelly. They did not at that time state or otherwise indicate in any way that they still wanted the trial court to assess damages separately against Hart and Imbrenda. Thus, their argument that the trial court erred in failing to do so was waived.
 IV.
The Kults next argue that the jury's general verdict was inconsistent because, although the jury returned a verdict in their favor, it awarded Ronald no damages.[4] The Kults argue that Ronald should have been awarded damages in connection with travel expenses he incurred traveling with his wife to her medical appointments and for the medical bills she incurred that he paid for, as well as damages in connection with his own loss-of-consortium claim. Kelly argues that Linda also testified as to their travel and medical expenses and that the $100,000 she was awarded compensated both her and Ronald for all of their expenses, and that the jury, by awarding Ronald no additional damages, deemed his loss-of-consortium claim to be without merit.
Ronald claims that the undisputed evidence at trial indicated that he spent at least $9,000 for travel expenses and that he charged a $9,000 down payment to his credit card for Dr. Chiu's treatment of Linda. However, as Kelly has noted, Linda testified as to those same expenses during the trial. InCook v. Sweatt, 282 Ala. 177, 209 So.2d 891 (1965), a husband and wife filed separate actions after the wife was injured in an automobile accident. The cases were consolidated for trial, and the husband appealed after the jury returned a verdict in his wife's favor, but also returned a verdict against him. This Court stated:
 "Since the appellant and his wife both claimed damages for the medical expenses incident to the treatment of the wife's injuries, we are of the opinion that both claimants should not be allowed to recover this expense. The trial court so charged the jury. This appeal is on a single record, consolidating the pleadings, rulings, testimony, and transcript of both cases.
 "We have no way of knowing from the verdict what damages the jury considered and included in their verdict, but we can tell from the evidence that they had an opportunity to include the medical expense in their verdict for the wife, and which she claimed in her suit."
Cook, 282 Ala. at 179, 209 So.2d at 892. The jury in the present case likewise "had an opportunity to include the medical [and travel] expense[s] in their verdict for [Linda]," and, as further discussed in Part V of this opinion, it is reasonable to assume that the $100,000 verdict returned in Linda's favor did, in fact, include those expenses. It was therefore in no way inconsistent for the jury not to simultaneously *Page 557 
compensate Ronald for those same expenses.
Ronald has also argued that the general verdict returned by the jury, finding in favor of the plaintiffs, indicates that it found Kelly liable on his loss-of-consortium claim and, therefore, that the jury's failure to award him any damages in connection with that finding of liability necessitates a new trial. This Court has previously stated that "[a]n award of zero damages on a verdict rendered in the plaintiffs favor is patently inconsistent" and ordered a new trial on that basis.Jones v. Carter, 646 So.2d 651, 653 (Ala. 1994). However, that principle is inapplicable here because the jury did not, in fact, find in favor of Ronald on his loss-of-consortium claim. Rather, the jury made no finding on that claim because the Kults waived that claim when the trial court did not instruct the jury on it and the Kults made no objection. In Regions Bank v. Plott, 897 So.2d 239,246-47 (Ala. 2004), we stated:
 "It is well established that "`[u]nchallenged jury instructions become the law of the case."' Alabama Dep't of Transp. v. Land Energy, Ltd., 886 So.2d 787, 795 (Ala. 2004) (quoting Clark v. Black, 630 So.2d 1012, 1017 (Ala. 1993)); BIC Corp. v. Bean, 669 So.2d 840, 844 (Ala. 1995). It is also a sound principle that juries are authorized to return verdicts only as to claims on which they have been instructed. Alpha Coal Co. v. National Cement Co., 420 So.2d 275 (Ala.Civ.App. 1982); Travelers Indem. Co. v. Capitol City Haulers, Inc., 393 So.2d 1012 (Ala.Civ.App. 1980). `Argument of counsel to a jury does not replace the court's charge to the jury The jury cannot be left without a rudder as to what [it is] called upon to decide and as to the law applicable thereto.' 393 So.2d at 1015 (emphasis added).
 "It hardly bears repeating that `[s]ubmitting [proposed jury] instructions is not sufficient to preserve an error in failing to give those instructions.' Salazar v. City of Chicago, 940 F.2d 233, 242 (7th Cir. 1991) (the plaintiff `waived [his] claim in the district court' by failing to object to the court's refusal to give his requested instructions; because the `court never instructed the jury on [that claim], . . . the jury had no opportunity to decide it'). When the [the plaintiffs] expressed their approval of the jury charge, which did not include instructions on their claim of intrusion on seclusion, they waived that claim, and the general verdict returned by the jury could not have been based on it."
In the present case, the trial court instructed the jury as to the negligence claim, but it made no mention in its charge of Ronald's loss-of-consortium claim. After completing the charge, the trial court expressly asked if there were any exceptions to the charge as given, and both the plaintiffs and the defendant replied that there were not. Accordingly, because the charge did not include instructions on the loss-of-consortium claim, that claim was waived "and the general verdict returned by the jury could not have been based on it." Regions Bank,897 So.2d at 247. Thus, there was no finding in favor of Ronald on the loss-of-consortium claim, and it was not inconsistent for the jury to award no damages on that claim.
 V.
The Kults argue, third, that the jury awarded Linda inadequate damages based on the evidence presented. They argue that Linda's expenses for the two surgeries performed by Dr. Chiu alone totaled more than $128,000 and that she was also entitled to damages for pain and suffering and mental anguish. Kelly, however, argues that the jury's award fairly *Page 558 
compensated Linda for all of her damages, including all proven medical expenses that were related to the accident, as well as an additional sum for pain and suffering and other injuries that were claimed.
We have previously stated that, once liability is determined, "`the jury's assessment of damages must include, at the least, an amount sufficient to compensate the plaintiff for his or her uncontradicted special damages, as well as a reasonable amount of compensation for pain and suffering."' Ex parteCourtney, 937 So.2d 1060, 1062 "(Ala. 2006) (quotingSmith v. Barring, 659 So.2d 678, 679-80
(Ala.Civ.App. 1995)) (emphasis omitted). The relevant question for us, therefore, is whether the evidence indicating that Linda incurred $128,000 of medical expenses because of the accident was uncontradicted. It was not.
At trial, Kelly did not dispute that some of Linda's medical expenses were incurred in treating injuries sustained in the automobile accident; however, Kelly also sought to show that some of Linda's medical expenses might have been incurred for the treatment of injuries not sustained in the accident. Specifically, Kelly sought to create a distinction between the injury to Linda's lower back and the injury to her middle back. In an effort to show that Linda's lower-back injury was not incurred in the automobile accident, Kelly emphasized that Linda herself testified that she did not begin experiencing symptoms that would indicate an injury to the lower back until almost a year after the accident, and that Dr. Schmitz, who examined Linda's back two years after the accident, concluded that, although she had injuries to her thoracic disks that were probably the result of the accident, she did not at that time have any lesions on her lumbar disks that necessitated surgery. The problem with the disks in the lumbar region, Kelly argues, was not discovered for another year — three years after the accident — when Linda sought treatment from Dr. Chiu. Consistent with this theory, Kelly's closing statement urged the jury to award Linda one-half of the $128,000 in claimed surgical expenses (presumably covering the procedure on the three thoracic disks but not the procedure on the three lumbar disks), plus an additional sum to compensate Linda for pain and suffering and other injury.
The Kults argued that all Linda's back problems were the result of the automobile accident, and they submitted testimony by Dr. Chiu, who had performed successful surgery on her back, to that effect. They also questioned the thoroughness of Dr. Schmitz's examination of Linda as well as his own recollection of his treatment of her.
In Akzo Chemicals, Inc. v. Lining Technologies, Inc.,611 So.2d 288, 289 (Ala. 1992), this Court stated:
 "It is well established that a trial court, as well as an appellate court, must presume that a jury verdict is correct `where there is some evidence, or a reasonable inference therefrom, to support the verdict, and that this presumption is strengthened when the trial court denies a motion for a new trial.' Thompson v. Cooper, 551 So.2d 1030, 1031
(Ala. 1989). Thus, the amount of damages to be awarded based on conflicting evidence is within the jury's discretion. Because, in this instance, there is conflicting evidence from which more than one inference could be drawn, the question of the appropriate measure of damages . . . should be [a] question[] for the jury."
In the present case, there was evidence from which the jury could have inferred either that all Linda's back problems were the result of the accident or that onlypart of her back problems were the result of *Page 559 
the accident. It is apparent from the jury's award of $100,000 that the jury drew the latter inference. Because there is evidence to support that inference, this Court cannot conclude that the damages awarded Linda were inadequate.
 VI.
The Kults next argue that defense counsel made inappropriate references to their collateral-source insurance during voir dire, when questioning a witness, and in both opening and closing statements. They argue that the parties agreed during an on-the-record conference that neither the Kults nor Kelly would bring up the topic of insurance and that Kelly's repeated attempts to do so entitle them to a new trial. See Pearsonv. Birmingham Transit Co., 264 Ala. 350, 353,87 So.2d 857, 859 (1956) ("With reference to an argument made by counsel emphasizing the existence of insurance carried by his opponent covering the transaction, this Court has taken the position that its influence is ineradicable, Standridge v.Martin, 203 Ala. 486, 84 So. 266 [(1919)]; Colquett v.Williams, [264] Ala. [214], 86 So.2d 381 [(1956)], and therefore it is not incumbent upon his adversary to move the court for a mistrial, but he has the privilege of waiting until there is an adverse verdict and then move for a new trial.").
However, none of the statements allegedly made by defense counsel during voir dire and opening and closing statements are in the record for this Court to review. In MontgomeryHealth Care Facility, Inc. v. Ballard, 565 So.2d 221, 225
(Ala. 1990), this Court considered a similar argument and stated:
 "Next, the defendants argue that the trial court erred in denying a motion for a mistrial because of statements made by counsel for the plaintiff during his opening statement. . . . The trial court has wide discretion in deciding whether an incident occurring during trial has affected a party's right to a fair trial, and its decision will not be reversed unless `it clearly appears that its discretion has been abused.' General Finance Corp. v. Smith, 505 So.2d 1045, 1049 (Ala. 1987). Here, the record does not contain a transcript of the opening statements. It is not clear what the plaintiffs counsel said or even if he made the alleged statement. We cannot say that the trial judge abused his discretion in denying the motion for a mistrial."
In the present case, it is likewise unclear exactly what was said about insurance during voir dire and opening and closing statements because the record does not include a transcript of those proceedings. Thus, we cannot conclude that the trial court exceeded its discretion by failing to grant a new trial on the basis of the alleged statements.
The only statement by Kelly's counsel that does refer to insurance and that is in the record occurred during Kelly's questioning of David Gruber, the police officer who investigated the automobile accident. The Kults allege that "in his direct examination of the investigating police officer, defense counsel read the police report aloud, including the fact that each defendant had liability insurance, thereby misleading the jurors into thinking that plaintiffs had already been compensated through insurance. . . ." (Kults' brief at pp. 36-37.) However, the Kults have misrepresented the actual testimony given at trial. The questioning referred to was as follows:
 "Q: I understand, Mr. Gruber, that you may not have a specific recollection of this accident that occurred five years ago, but looking at your report — and I'm reading over your shoulder — for each of the, these *Page 560 
drivers, you wrote down the name, correct?
 "A. That's correct.
 "Q. Their address?
 "A. That's correct?
 "Q. Zip code?
 "A. Correct.
 "Q. Telephone numbers?
 "A. Correct.
 "Q. Date of birth?
 "A. Correct.
 "Q. Race, sex, driver's license date?
 "A. Correct.
 "Q. Driver's license number?
 "A. That's correct.
 "Q. Place of employment?
 "A. Correct.
 "Q. Style or make and model of vehicle?
 "A. Correct.
 "Q. Vehicle identification number?
 "A. Correct.
 "Q. Tag number?
 "A. Correct.
 "Q. Whether or not — well, whether or not they may have had insurance?
 "A. That's correct.
 "Q. Do you have anything — you've got estimated speeds?
 "A. That's correct.
 "Q. It would seem to me that you would get that information from talking to these folks, wouldn't it, sir?
 "A. Yes, sir."
(Emphasis added.) This testimony reveals that — contrary to the Kults' assertion — there was never any
mention to the jury, during Gruber's direct or cross-examination, of whether any of the drivers involved in the accident had insurance. Defense counsel merely asked Gruber whether he had noted in his report "Whether or not" the parties involved in the accident had insurance. Counsel did not ask, and the witness did not volunteer, which drivers in fact did or did not have insurance. The Kults' argument that this testimony somehow misled the jury into thinking that they had already been compensated through insurance is itself misleading and is without merit.
 VII.
The Kults fifth and final argument is that Alabama's opt-out process, see generally Lowe v. Nationwide InsuranceCo., 521 So.2d 1309, 1310 (Ala. 1988), is unfair, especially in a case like the present one because the two policies providing uninsured/underinsured-motorist coverage were both issued in Minnesota under Minnesota law, which, the Kults allege, does not provide for an opt-out procedure. The entirety of the Kults' argument in this regard is as follows:
 "The opt out process under Alabama law, which is provided to insurance companies in uninsured and underinsured motorists cases, is unfair and in this particular case was especially unfair in that both contracts providing uninsured coverage were issued in the State of Minnesota under Minnesota law which does not provide an opt out procedure. This case is a perfect example of how the opt out process can be used to punish the victim under the guise of protecting the rights of the insurance company and instead rewarding the tortfeasor.
 "As the record will reflect, Auto Owners Insurance Company, which insured the vehicle in which Mr. and Mrs. Kult were passengers and which provided uninsured motorist coverage to the plaintiffs, had been allowed to opt out and their attorney then moved over and represented the tortfeasor `to protect *Page 561 
the insurance company's interests.' (C. 307)."
(Kults' brief at pp. 39-40.) Notably absent from this argument is any citation to statute, caselaw, or other authority. We have previously stated that "[w]here an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court's duty nor its function to perform all the legal research for an appellant. Rule 28(a)[(10)], Ala. R.App. P." Sea CalmShipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala. 1990). For this reason, we decline to address this argument further.
 VIII.
The Kults have argued that the judgement entered on the jury's verdict awarding damages is plainly and palpably wrong and that they are accordingly entitled to a new trial on that basis. We disagree. There is evidence to support the jury's calculation of damages, and the Kults have not identified any reversible error. For these reasons, the judgment of the trial court is affirmed.
AFFIRMED.
COBB, C.J., and LYONS, BOLIN, and MURDOCK, JJ., concur.
[1] Although the Kults are residents of Minnesota, they regularly spend the winter months in Alabama.
[2] No first name is provided in the record for several of Linda's doctors.
[3] Billy Jack Kelly had died before the Kults filed this action; his wife, Sherlyn Kelly, as administrator of his estate, was subsequently substituted as a defendant.
[4] The completed verdict form read: "We, the Jury, find in favor of Plaintiffs and against Defendant, and we award damages in the amount of $100,000 for Linda Kult and $0 for Ronald Kult." (Emphasis added.)